# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| TANYA FARLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | )  Case No. 2:16-cv-04302-NKL ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) ) |
| Defendant. | ) ) |

## ORDER

Plaintiff Tanya Farley appeals the Commissioner of Social Security's final decision denying her application for disability and disability insurance benefits under the Social Security Act. The decision is affirmed.

**I.    Background**

Farley was born in 1972 and claims a disability onset date of 1/21/2014. The Administrative Law Judge held a hearing on 3/4/2015 and denied Farley's application on 5/22/2015, and the Appeals Council denied her request for review on 8/1/2016. In this appeal, Farley focuses on mental health issues.

**A.    Mental health history**

On the recommendation of her therapist, Farley established care with a psychiatrist, Rameshlal Rawlani, M.D. on 1/31/2014. Farley told Dr. Rawlani that her primary care doctor had prescribed medication, Prozac and Trazadone, and that her depression was better with therapy and medication. Exam showed that her behavior was appropriate and cooperative; she made good eye contact; her affect was euthymic; she had flow of logical, goal directed thought;

she had no delusions; her insight, judgment, and memory were fair; and her attention and concentration were good. Tr. 370. The doctor diagnosed dysthymia; instructed her to continue the medications that her primary care doctor had prescribed, and continue therapy; and to return in six weeks.

At a visit with her primary care physician, Paul Bernabe, M.D., in February 2014, the doctor advised her about relaxation and stress reduction for managing depression.

Farley saw Dr. Rawlani on 4/2/2014. Her mental status exam results were the same as her 1/31/2014 exam results. Tr. 356-57. She said her medications were not helping. The doctor prescribed Wellbutrin, and instructed her to continue therapy and return in four weeks. Later the same month, Farley reported that the Wellbutrin made her itch, so Dr. Rawlani prescribed Paxil instead.

At a medication management visit with Dr. Rawlani on 5/30/2014, Farley said she was doing okay, but might be depressed in the future because her father was going to pass away. She said her anxiety was good, looked happy, was satisfied with her current medication, and said she felt "10 out of 10." Tr. 334. Mental status exam was normal and the doctor noted that Farley's condition was stable. He instructed her to return in six weeks.

On 7/11/2014, Farley told Dr. Rawlani that she was doing okay, her anxiety was good, she looked happy, and said she felt "7 out of 10." Tr. 326. She said her sleep was disrupted. Mental status exam was normal. Dr. Rawlani continued the Paxil and added Trazadone for sleep, and instructed Farley to return in six weeks.

On 8/15/2014, Farley told Dr. Rawlani that her father had passed away two days earlier. Farley was not in acute distress and the mental status exam was normal. The doctor continued Farley's medications, and instructed her to continue therapy and return in six weeks.

On 9/26/2014, Farley's mental status exam findings were normal. She told Dr. Rawlani that she could not afford her medications. The doctor arranged to give her samples of Vibryd or Brintellix, and instructed her to continue therapy and return in six weeks. She followed up on 11/5/2014 and asked for more samples. Mental status exam was normal and Dr. Rawlani instructed her to return in six weeks. On 12/17/2014, Farley told Dr. Rawlani that she was feeling better on the Brintellix and he noted that Farley was alert, cooperative, oriented, and smiling. He instructed her to continue therapy and return in six weeks.

On 1/28/2015, Farley was still doing well on her medication, and reported good mood, sleep, and energy. Dr. Rawlani noted she was alert, cooperative, and smiling. He continued Farley's medications, and instructed her to continue therapy and return in eight weeks. Her next visit with Dr. Rawlani, on 3/25/2015, was essentially the same and she reported that she was "doing alright[.]" Tr. 289. On 5/27/2015, Farley was not in distress although she reported having physical problems. Dr. Rawlani continued her medications, and instructed her to continue therapy and return in six weeks.

A short, "Multi-Service Progress Note" dated 7/1/2015, bearing Dr. Rawlani's electronic signature, states that Farley's "case was discuss for consultation by her case worker[.] [Sic.]" Tr. 273. The Progress Note gives some background about Farley's medical and psychiatric history, ending with the note, "Pt been reporting she is doing good on Brintellix. [Sic.]" *Id.* The Progress Note continues,

> Problem. After she is on Medicaid therapist report not actively encourage with treatment protocol. May be due to her health condition. Has multiple medical problem not doing proper f/u, totally dependent on caseworker for her physical and mental health. Since caseworker was unable to take her eye appointment she is mad with caseworker.
>
> Plan. Encurrage pt to participate more activities for her physical

3

and mental health, encourage to keep medical and psychiatric appointments. Comply with treatment recommendation. Home health care if appropriate for benefits[.]

*Id.* [Sic.]

Farley saw a therapist about every two weeks throughout 2014 and until April 2015. At some visits, she reported feeling down, and displayed rapid speech and poor eye contact, Tr. 338, 348; or appeared depressed, Tr. 317, 318, 346, anxious, Tr. 301, 362, or angry and sad, Tr. 282, 288. At others, she reported feeling "stressed," Tr. 294, 295, 330. At others, she reported feeling "pretty good" or "okay," Tr. 332, 338, or presented with a somewhat elevated mood, Tr. 319, 364, calm mood, Tr. 286, 306, 312, 366, or happy mood, Tr. 300, 311. In June 2014, she told the therapist that she had "a new man in [her] life," Tr. 332, and in August 2014, said that she was down because the relationship was struggling. She reported that she fought with her mother. *E.g.,* Tr. 338.

In March 2015, Farley told her therapist that was "doing okay with anxiety and depression" and did "not really" have any additional goals for therapy, and discussed discontinuing services. Tr. 293. At her 4/14/2015 session, Farley was unsure about discontinuing services, and decided to schedule her next appointment for two months later. Tr. 286. On 6/9/2015, Farley was angry, telling her therapist that everyone "hate[d]" her (Farley) for quitting group therapy and she was being ignored by her caseworker and the office staff. Tr. 282. Farley said she wanted to continue therapy, however.

**B.     Expert opinions**

Charles Watson, Psy. D., the state agency psychological consultant, reviewed the records and on 4/3/2014 opined that Farley's psychiatric condition was non-severe and did not prevent her from working. Tr. 74, 78. The ALJ gave the opinion little weight. Tr. 19.

Dr. Rawlani filled out a Medical Source Statement—Mental form on 8/12/2015. Tr. 419-20. The doctor listed Farley's initial diagnoses as major depression, recurrent; dysthymia; and mood disorder secondary to major depression. Where asked on the form whether the patient had any side effects from medications, the doctor checked "No." Tr. 419. Where asked whether the patient would have "bad days" causing her to leave work prematurely or be absent, the doctor checked "Yes," but where asked how many days per month would be missed—1, 2, 3 or 4—the doctor did not check any box. *Id.* He checked "Yes" and wrote in "Mild" with respect to whether the patient would be "off task" from symptoms that would interfere with attention and performing simple tasks, and checked the box indicating that the patient would be off task "25% or more" of the time. *Id.* Dr. Rawlani checked off "moderate[] limit[ations]" with respect to understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention for extended periods; performing activities with a regular schedule; working in coordination with or proximity to others without being distracted; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. Tr. 419-20. He checked off "marked[] limit[ations]" with respect to ability to complete a normal workday and workweek without interruption from psychologically based symptoms. Tr. 420. The ALJ gave Dr. Rawlani's opinion partial weight.

A vocational expert, John McGowan testified at the 10/15/2015 hearing before the ALJ. McGowan was asked by the ALJ about the work that could be performed by a hypothetical individual with a high school education, Farley's work history, and no past relevant work experience, who could do light exertional work with certain limitations, and who would be capable of performing simple and routine tasks throughout the workday, with occasional

interaction (no more than a third of the total workday) with supervisors, coworkers and the public. McGowan testified that the person could perform the requirements of representative occupations such as: (1) merchandise marker (DOT #209.586-034); (2) inspector and hand packager (DOT #559.687-014); and (3) assembler of plastic products (DOT #712.687-010), jobs existing in significant numbers in the national economy. McGowan stated that his testimony was consistent with the Dictionary of Occupational Titles, and that if the individual was absent once a week, four times per month, then the individual would not keep her job.

### C. Farley's reports and hearing testimony

In her adult function report dated 1/30/2014, Farley stated that she stayed at home, unless she had a reason to go out, such as a doctor appointment or therapy. She cooked if she felt like eating or was in the mood to cook. She spends time watching television and movies, and reading celebrity autobiographies. She can do her own grocery shopping. She goes to a friend's house every two weeks. She does not need reminders to go places; does not need anyone to accompany her; does not have problems getting along with family, friends, neighbors, or others; has "no problems" getting along with authority figures; has never been fired from a job because of problems getting along with others; and has "no" "unusual behaviors or fears[.]" Tr. 198-203. Where asked on the form, "For how long can you pay attention?," Farley wrote, "No problems with that at all." Tr. 202. Where asked, "Do you finish what you start?," Farley checked, "Yes." *Id.* Where asked, "How well do you follow written instructions?," she wrote, "From beginning to end." *Id.* Where asked, "How well do you follow spoken instructions?," she wrote, "Easily." *Id.* Farley could manage her own finances, including paying bills, handling her savings account, counting change, using a checkbook, and completing money orders.

At the 10/15/2015 hearing before the ALJ, Farley testified that she had worked as a gas

station cashier for several years. She was fired from her last job in 2013 because she had no transportation, and did not look for other work afterward because she had no way to get to work. Tr. 32. She experienced depression, some of which was related to physical health problems, and felt that the depression symptoms had made it difficult to work and deal with customers at work some days. She was not being treated for depression while she was working as a cashier. Tr. 47-48. She said her depression had lately been causing her to stay in bed all day, about once a week, and she had bad days three or four times a week. She was living with her mother, with whom she did not get along, and said that moving out might help with her depression. Tr. 50. She said she had stopped going to Pathways, where she received mental health treatment, in July 2015 because she "had issues with them." Tr. 42.

When asked by the ALJ, she testified that she was able to get along with cashiers when she went grocery shopping. TR 52. She also said she had a cell phone and "text[ed] on it quite a bit to a few people[,]" specifically, "[g]uys off a dating website." Tr. 53. She said she used to meet with them in person but hadn't for about a year. Farley's caseworker used to take her to McDonald's and Hardee's in Eldon so she could use Wi-Fi and get on Facebook, but Farley hadn't gone in about a month and a half. She said she stopped doing it not because of depression but because of a problem getting transportation from her caseworker. Tr. 54.

Farley's work history report shows that from 1995 to 2000, Farley earned between $11,151 and $17,334 per year; from 2001 to 2002, she earned $2,448 to $8,376 per year; from 2003 to 2006, she earned $12,128 to $16,338 per year; from 2007 to 2009, she earned $1,647 to $9,650 per year; from 2010 to 2012, she earned $13,545 to $14,536 per year; and in 2013, the year she was fired, she earned $2,485.

### D. The ALJ's decision

The ALJ found that during the relevant period, Farley had severe impairments of depression, dysthymia, anxiety disorder, diabetes mellitus, neuropathy, and retinopathy. Farley did not claim to meet any Listings, and the ALJ did not find that she met any. The ALJ found that Farley has the residual functional capacity to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) and 416.967(b) in that she can lift, carry, push, and/or pull 20 pounds frequently and 10 pounds occasionally. She can stand and/or walk six hours out of an eight-hour workday. She can sit for six hours out of an eight-hour workday. However, she can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. She would need to avoid hazards such as dangerous machinery or unprotected heights. She is capable of performing simple and routine tasks throughout the workday. She is limited to occasional interaction with supervisors, coworkers, and the public, defined as comprising no more than one-third of the total workday.

Tr. 15.

The ALJ concluded that Farley was not capable of performing past relevant work but could perform the requirements of representative occupations such as: (1) merchandise marker (DOT #209.586-034); (2) inspector and hand packager (DOT #559.687-014); and (3) assembler of plastic products (DOT #712.687-010), jobs existing in significant numbers in the national economy. The ALJ denied benefits.

## II. Discussion

Farley argues that reversal is necessary because the ALJ's credibility determination and decision to give only partial weight to the opinion of her treating psychiatrist, Dr. Rawlani, are unsupported by substantial evidence.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v.*

*Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id*. The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

   **A.   Credibility**

Farley argues that reversal is necessary because the ALJ's credibility determination is not supported by substantial evidence.

An ALJ assesses the credibility of a claimant's subjective complaints by considering: (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000); 20 C.F.R § 404.1528 (2015) (regulations require similar analysis). The ALJ may also discount a claimant's subjective claims based on "inherent inconsistencies" in the record. S*ee, e.g., Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) ("An ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of inherent inconsistencies or other circumstances.") (citation and internal quotation omitted).

With respect to daily activities, the ALJ stated that Farley did laundry, cooked, and

9

cleaned; shopped for groceries; and spent time with friends; managed her own finances, including paying bills, handling her savings account, counting change, using a checkbook, and completing money orders. Farley also engaged in leisure activities that reflected on her ability to concentrate, including watching television and movies, and reading celebrity autobiographies, and admitted to the ALJ that she texts a great deal, and visits McDonald's and Hardee's to access Wi-Fi and get on Facebook when she has transportation. Such activities support the conclusion that Farley retained more work capacity than she was willing to admit. *See, e.g., McDade v. Astrue,* 720 F.3d 994, 998 (8th Cir. 2013) (McDade "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart."); and *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003) ("Although participation in these activities does not dispositively show that Ms. Curran-Kicksey's complaints of pain were exaggerated, they certainly were appropriate matters for the ALJ to consider under *Polaski*."). Farley argues that she need not be "bedridden" or "completely helpless" to be found disabled, and that her daily activities were "not as robust" as the ALJ had concluded, pointing to complaints of social problems like conflicts with her mother and caseworker. Doc. 8, p. 21. Such evidence at most conflicts with Farley's daily activities cited above, and it was the ALJ's task to resolve those conflicts. *Rutledge,* 230 F.3d at 1174.

With respect to duration, frequency, and intensity of symptoms, the ALJ performed a detailed review of Farley's mental status exams over the relevant period, and Farley's reports to her psychiatrist concerning her symptoms. Tr. 17-18. The medical record showed that Farley had generally unremarkable mental status exams, including no problems with attention and concentration, her eye contact was good, and she had normal speech, and thought content and

processes. In her Adult Function Report, Farley stated that she had "no problems…at all" in paying attention, could finish what she started, could follow written instructions "from beginning to end," could "easily follow" written instructions," had "no problems" getting along with authority figures, and had never been fired from a job because of problems getting along with others. Tr. 198-203. Farley challenges the ALJ's focus on her mental status, pointing out that she sometimes exhibited fleeting eye contact, rapid speech, depressed demeanor, and required redirection while speaking. Doc. 8, pp. 19-20. She also cites a July 2015 Progress Note that states she was "totally dependent" on her caseworker for "physical and health," but that she should be encouraged to participate in treatment. Tr. 273. Nothing in Farley's treatment record demonstrates that any such symptoms would prevent her from engaging in substantial gainful activity for a continuous period of 12 months, as required to establish entitlement to benefits. 42 U.S.C. sec. 423(d) and sec. 1382c(a)(3)(A). In any event, to the extent that there was conflicting evidence, it was the ALJ's task to resolve those conflicts. *See, e.g., Rutledge v. Apfel,* 230 F.3d 1172, 1174 (10th Cir. 2000) (it is within the ALJ's province to weigh and resolve evidentiary conflicts and the reviewing court will not re-weigh the evidence).

Finally, there is no evidence that any doctor placed work restrictions on Farley. *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003) (a lack of physician-imposed restrictions may serve as a reason to discredit a claimant's credibility).

The ALJ also considered Farley's work history as undermining her credibility. Doc. 8, p. 21. Although, as Farley argues, she did have some better years of earnings, her work history is sporadic, which is a factor that may be weighed against her credibility. *See also Bernard v. Colvin,* 774 F.3d 482, 489 (8th Cir. 2014) (ALJ may consider the claimant's sporadic work history as a factor weighing against his credibility). In addition, when she was fired in 2013

from her last job, it was not for any reason related to depression but because she lacked transportation. She admitted that she did not look for more work after being fired, because of her transportation problem. Substantial evidence on the whole record supports the ALJ's conclusion that Farley's work history undermining her credibility.

The ALJ carefully considered Farley's credibility based on the record as a whole, and cited factors supported by substantial evidence, including Farley's daily activities, clinical signs and symptoms, effectiveness of her medications, lack of functional restrictions, and sporadic work history. The Court will not substitute its opinion concerning credibility for the ALJ's. *See Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."); *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) ("We defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth.") (internal citations omitted)).

### B. Weight given the opinion evidence

Farley further argues that reversal is necessary because the ALJ did not properly weigh the opinion evidence provided by Dr. Rawlani, Farley's treating psychiatrist, and the RFC is therefore not supported by substantial evidence.

Dr. Rawlani filled out a checkbox form. He indicated that Farley did not have side effects from her medications. He indicated that she would have bad days, causing her to miss work, but did not indicate how much time she would be expected to miss. He noted that she would have "Mild" problems being off task, 25% or more of the time. Dr. Rawlani checked off "moderate[] limit[ations]" with respect to understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention for extended periods; performing

activities with a regular schedule; working in coordination with or proximity to others without being distracted; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. Tr. 419-20. He checked off "marked[] limit[ations]" with respect to ability to complete a normal workday and workweek without interruption from psychologically based symptoms. Tr. 420.

The ALJ gave Dr. Rawlani's opinion partial weight, explaining that the limitations were not mentioned in the treatment records, and were not supported by objective testing or reasoning explaining why the limitations existed. Tr. 20. The opinion was also in checkbox form, without supporting reasoning or clinical findings. *Id.* Finally, the ALJ explained, in light of the evidence showing no more than moderate limitations on day-to-day functioning, the doctor's assessment was "somewhat inconsistent[.]" *Id.*

Factors considered in weighing medical opinion evidence include the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.927. Generally, if a treating doctor's opinion is well-supported and not inconsistent, it will be afforded controlling weight. Social Security Ruling 96-2p, 1996 WL 374188 ; 20 C.F.R § 416.927(c)(2). Nonetheless, any opinion may be rejected if it is unsupported or inconsistent with the record *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010); 20 C.F.R. § 416.927(c)(2).

The ALJ declined to afford Dr. Rawlani's opinion controlling weight because it was not supported by or consistent with the treatment notes he prepared. Tr. 19-20. First, the ALJ

pointed out that Farley's treatment records and objective testing revealed that she was performing better than Dr. Rawlani suggested. As noted above, the ALJ had expressly, and in detail, discussed Farley's treatment records, which showed she had good attention, concentration, and memory, and had generally unremarkable mental status exams. Dr. Rawlani had never ordered any kind of work restriction. Farley also admitted in her Adult Function Report that she had no problems in paying attention, could finish what she started, could follow written instructions from beginning to end, could easily follow written instructions, had no problems getting along with authority figures, and had never been fired from a job because of problems getting along with others. She was responding well to medication and the doctor encouraged her to continue with therapy.

The ALJ also pointed out that Dr. Rawlani's opinion form was in a checkbox format, and the doctor had not provided the explanatory support that would have been needed to afford the opinion controlling weight. Tr. 20. When a doctor provides his form in checkbox form, without explanation or little correlation with the other evidence in the record, the ALJ is not required to defer to that opinion. *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (an ALJ may reject a checklist form where the limitations listed on the form were not reported in the physician's treatment records or supported by objective testing or reasoning); and *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (substantial evidence supported the ALJ's rejection of a medical source opinion that consisted of "three checklist forms, cites no medical evidence, and provides little to no elaboration").

The ALJ also stated that in light of the evidence showing no more than moderate limitations on day-to-day functioning, the doctor's assessment was "somewhat inconsistent[.]" Tr. 20. As discussed above, the ALJ had cited Farley's daily activities, like doing laundry,

14

cooking, and cleaning; shopping for groceries; spending time with friends; and managing her own finances, including paying bills, handling her savings account, counting change, using a checkbook, and completing money orders. The ALJ also cited leisure activities in which Farley engaged, including watching television and movies, and reading celebrity autobiographies. Farley also admitted to the ALJ that she texts a great deal, and visits McDonald's and Hardee's to access Wi-Fi and get on Facebook, when she has transportation. The ALJ's assessment of Farley's day-to-day functioning is supported by substantial evidence on the whole record.

Farley argues that, since the ALJ assigned the opinion "partial" weight, he should have offered further detail regarding which limitations he had decided to adopt with respect to the RFC. Doc. 8, pp. 16-17, and Doc. 12, pp. 2-3. However, the ALJ was not required to state how much weight he was giving Dr. Rawlani's opinion at all. *Grable v. Colvin,* 770 F.3d 1196, 1202 (8th Cir. 2014). "An ALJ need only clarify whether [he] 'discount[ed] [a treating physician's] findings, and, if [he] did so, why.'" *Id.* (citing *McCadney v. Astrue,* 519 F.3d 764, 767 (8th Cir. 2008)). An "ALJ satisfie[s] that obligation by expressly refusing to give [a treating physician's] opinion" great or controlling weight, "and then explaining [his] reasons for doing so." *Id.* As discussed above, the ALJ explained why he did not give Dr. Rawlani's opinion controlling weight, and the decision is supported by substantial evidence on the whole record. The ALJ was not required to explain which parts of the opinion he gave partial weight.

Finally, an ALJ has the primary responsibility for formulating residual functional capacity based on the record as a whole, and is not required to base it on any particular medical opinion. *See* 20 C.F.R. § 404.1527(d)(2) (Commissioner uses medical sources to "provide evidence" regarding several factors, including residual functional capacity, but the "final responsibility for deciding these issues is reserved to the Commissioner"), and *Martise v. Astrue*,

641 F.3d 909, 927 (8th Cir. 2011) ("[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.") (citing *Schmidt v. Astrue,* 496 F.3d 833, 845 (7th Cir.2007)). *See also Partee v. Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) ("Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the RFC."); and *Babcock v. Colvin*, 538 F. App'x 738. 738 (8th Cir. 2013) (ALJ's RFC determination affirmed where it was "was based on consideration of the relevant factors and some medical evidence").  Here, as discussed above, Farley's medical treatment records, her Adult Function Reports, and her testimony demonstrate the RFC is supported by substantial evidence on the whole record, including medical evidence.

Farley's argument concerning the weighing of the opinion evidence and support for the RFC therefore fails.

**III.  Conclusion**

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  September 19, 2017  
Jefferson City, Missouri